with Case No. 16-40733, United States v. Gonzales-Gomez. And is it Hajar or Hayar? Hajar. Okay. Please, come forward. Good morning, Your Honor. This is a case that's very unusual when we look at the Fourth Amendment violations that happened. On July 22nd in the afternoon, a pickup truck driving from Boca Chica Beach in South Texas toward Brownsville. The beach is about 20 miles east of the city. It's driving east-west on Highway 4. It gets to a checkpoint. There is a little post that's supposed to check if some people are coming illegally through the river or bringing some illegal merchandise or trafficking anything. Okay. Let me just ask you, we're familiar with the basic facts, but in reading your brief, I was a little bit unclear. You say several times that the original checkpoint is legitimate. Terry, stop, check it. I think you've essentially conceded that the referral to secondary inspection when they didn't have ID was okay. So at what time, and I mean literally time on a clock, how many minutes in or at what time on the clock do you believe it went from a proper stop to an improper seizure? The problem I have, Your Honor, is when we had the suppression hearing, and then we had the preliminary exam initially, a suppression hearing, and then at the trial, the same facts were given by the government. And if you look at the brief and the transcripts, they do not, at no time did the government give a timeline what information they knew when. And for the purpose of the brief, I said it didn't matter what they got. Whatever they got, let's say within 10, 15 minutes after being referred to secondary, that would have been all the reasonable time needed to see if there is reasonable suspicion to proceed any further. Most of the appellate cases that dealt with forced amendment violation, you stop a car, you talk some time, and then you find something. And then there'd be a whole factual issue. Was this an arrest? Wasn't it an arrest? In this particular case, they were literally arrested, booked, and it's only the second day that comes the incriminating evidence. So I believe that within 10 minutes, which have been reasonable time at this time to verify, this alleged stop to check the immigration status of Mr. Esquivel, which was the co-defendant in the case, who was a passenger in the vehicle in the back. What you have, you have the... Okay, but you would agree that if during, so they have the first stop is to check immigration status, you say within 10 minutes, they should have been able to do that. But isn't it true that there is evidence that within that time period, the other officers appeared and were on their way and appeared and were the ones who knew about the drug situation? Because if during that period, when you're looking for immigration, let's say that during that time period, somebody burst out and said, oh, we also have a bundle of marijuana in the middle of that. You would agree that once reasonable suspicion exists for some other crime, they can prolong the detention to examine that other crime, right? Just in general, hypothetically, not in this case. So what evidence is there that they didn't, at least collectively among the officers involved, have knowledge that would have at least given them reasonable suspicion to prolong the original immigration detention and make it into a drug detention? Your Honor, if you would review the transcript of the preliminary exam and the suppression hearing, the government, which had the burden to show that they had enough information to proceed further, they never said they did. In fact, up to the point of their arrest, which appears clearly at the preliminary exam, the story was they're checking if he's, if Mr. Gonzalez would have been the coyote for Mr. Esquivel. No, I mean, I think they, they clearly say they also knew about this other tanker and that it wasn't working, that had the bundles of marijuana near it. I mean, that was certainly known to Davidson and Garcia. Yeah, but that was 45 minutes later, Your Honor. Okay, that just depends on the timing, right? Because they say they got there, Davidson says he got there at 2.50. There's been some suggestion it was 2.55. And the evidence is that the stop was at 2.45. So that's within your 10 minutes that you're kind of saying is reasonable for the immigration. These guys that know about the drugs show up. Your Honor, when they were, when Mr. Davidson arrived at the checkpoint to continue his investigation, the drugs that they're talking about, while it's like quarter of a mile away from the tanker, there's no drugs in the tankers. There is no evidence in the tankers that ties Mr. Gonzalez to that place. So in fact, even if, if the court were to assume, and it hasn't been established, that they had some information about the tanker and the drugs found at the beach, it's still, there is nothing incriminating. Yeah, but the tanker and the drugs are tied to Esquivel and Esquivel's in the car with your client. So that's the connection. This was not known, or at least the government never established it was known at the time, your Honor. Okay. Now, but what about the three men in the back seat with no identification? Your Honor, there was Mr. Gonzalez. Aren't they there to see that only citizens go through? That is correct. There are three people, but one of them they're looking for, for suspicion. None of them have any identification. They were children, your Honor. Doesn't that bring them, don't they have a reason to go to secondary? I conceded they could send them to secondary, your Honor. This was a man, his wife, his child, his stepchild, and the young man with them. I understand where your client was and his wife was, but what about the three men in the back seat? There were no three men, your Honor, excuse me. What? There was only his daughter, his stepdaughter and the child, a five-year-old child, and another young man who was 20 years old, I believe, Mr. Esquivel, the co-defendant. Well, Esquivel, or however you pronounce his name, he didn't have any identification. That's correct, your Honor. What? That is correct, your Honor. It is correct, your Honor. He did not have an identification, but when they asked him... Is that a problem? No, your Honor. At this checkpoint, the agents on the stand testified that they do not detain someone if he has no ID coming from the beach. In and of itself, not having an ID does not become a probable cause of being illegal, your Honor, in this country. And, in fact, there was an issue at trial where Mr. Esquivel... But the question is whether it allows them to investigate further. Once they went to secondary, was there anything that the agents did to investigate Esquivel's status? Because he'd given them information. Did they make any phone calls or do anything else to verify what he said or disprove it? No, your Honor. And, in fact, he told them, I could call someone and they'll bring my ID. He told them he was born in the U.S. They never asked him about his Social Security. He told them what high school he went to in Brownsville. There was an issue at trial when Mr. Davidson is testifying. He said, well, he doesn't speak good enough English. And then they answered, well, is it unusual in Brownsville that people wouldn't have an accent or not be fully fluent in English? That, by itself, would not... Well, I think the point there, yes, sometimes people can be citizens and not speak English well. However, in his case, if he says he was born and raised in the U.S., typically then that implies some familiarity with English. So I think that was his point of just questioning that, not saying one way or the other that I agree with that, but that was his point of questioning it. But I want to get back to the issue of fairly soon after they're at secondary, Davidson and Garcia show up and they have, at least collectively, knowledge of this tanker and the marijuana bundles and all of that. So even if they didn't fully pursue the immigration issue, at this point they have reasonable suspicion of the drug issue. Your argument is that the evidence that they had discovered with the tanker truck isn't sufficient to pursue the drug issue? That's correct, Your Honor, because there were no drugs in the tanker truck and there are other tankers in the immediate area where the drugs were found. And there are two individuals that were going to the house where the dock is where the drugs were found. In fact, you have drugs, you have a tanker, you have other tankers, you have other people going to the house. At this time, there is nothing. I understand that argument, whether I agree or disagree. I understand it. Let me ask you something that isn't really addressed very much in the briefs, which is, I don't think you have your client as standing to suppress Esquivel's statements. And since Esquivel testified at trial, what is it that's new and different about what your client said that you're trying to suppress? In other words, if your client's statements were suppressed, but Esquivel still testified in all of that, what would be different about the trial, specifically? Yes, Your Honor. First of all, Your Honor, in this particular trial, the jury was hanged after the trial, and it's after an Allen charge he got convicted. And the only reason, the only issue in my appellate brief is his own statement. I understand that. But usually there's some discussion of what it is in the statement that bothers you. And I didn't see that in your motion to suppress, and it's not in your brief. So I'm asking specifically, what statement did your client give that you think, if suppressed, would have led to a different outcome at trial? Your Honor, all the facts, including the admission of Mr. Esquivel, could have led that Esquivel was going to pick up some drugs. The only evidence that would reinforce the culpability of my client at trial is the conflicting stories about what they were going to do with the investigation agents to proceed further. Because the story I said initially is completely corresponding to the facts. They never denied they were in that truck. My guy said, I was hired by Esquivel to drive that tanker to go to the beach and do a tank job, a septic tank. Esquivel said we were going to water with it. The statement of my client conflicting with Esquivel's client is what tipped the scales in a case that was so close to read to a hung jury initially. If my guy has no statements at all, Your Honor, then all the story of Esquivel would be, Esquivel is a bad guy, he went to do something wrong, but there is nothing... Yeah, but he implicates your client. But that would have been only his testimony, Your Honor. But that's always true. I mean, it's still true that if you don't believe Esquivel, then you would believe the statement of your client that it was just a septic repair or whatever, and he's an unwitting dupe in Esquivel's grand scheme. Actually, your client's statement helps to explain an innocent reason why he's there. If you suppress that, then the only story is Esquivel's story, unless your client testifies. Your Honor, if my client's story is not compared to Esquivel's story and the conflicting story, it wouldn't have been enough to get a probable cause against him. In fact, the probable cause would have proceeded just because of the conflicting story. Why isn't Esquivel enough for not just probable cause, but to convict? If believed, I agree, you might not believe him, you might... That's a jury question. But if believed, why isn't Esquivel enough by himself to convict your client? The trial strategy would have been to say exactly what Your Honor said, that he's just a dupe of Esquivel, and Esquivel is making him take all the... without him testifying. If I could make an analogy, Your Honor, if I'm planning on robbing a bank, and I know this young lady drives a Porsche and goes real fast, and I would tell her, would you take me to the bank? Now, maybe I told her I'm planning on robbing the bank, maybe I didn't. This fact would be... I get to the bank, and I notice there's too much law enforcement, and I decide, let's just go have lunch. At that time, there was no crime that ever happened. Can I be charged with robbing the bank? Now, going at trials that you're planning on robbing the bank, using the testimony only of the driver, that yeah, he told me we're going to rob the bank, by itself would not have been enough. It's only the conflicting story between the driver or the two people that were going that would tip the scale toward finding guilt. Let me ask you two questions about your client's statement. First of all, I think it was made the second day he was being held. How long was he being held? Why wasn't he taken to a judge at that point? But secondly, I don't quite understand how it came about that the brief says something like he volunteered to the agent? I mean, did he say, I want to talk to those guys if he's being held in a cell? It doesn't make sense to me. It's not my client. It's Mr. Esquivel. The co-defendant, the next day, he's a young man, he's trying to say, I know lots of things. And they had a bunch of stuff on the other guy from previous cases. If you notice, the indictment has three counts. The third count only deals with Esquivel about the crimes that happened earlier. So in fact, for Mr. Esquivel, he'd be convicted of the third count anyway, with or without this particular trial. He had nothing to lose. Well, and he pled guilty. I understand. But he had nothing to lose. But how long were they held without going to court? I think it was like about 36 hours, Your Honor. But my client did it even when he was given his Miranda warnings. He was given his Miranda warnings on the grounds that he's being held as a potential coyote to Mr. Esquivel. Yet the government had all the evidence that Mr. Esquivel was not illegal, Your Honor. All right. You have saved time for rebuttal. We appreciate your argument. Thank you, Your Honor. Mr. Schroeder? May it please the Court, my name is Joseph Schroeder, and I am here on behalf of the United States. This case comes down to the fact that first, defendant's stop was justified at its inception, as Border Patrol agents have authority, even absent reasonable suspicion, to stop vehicles at checkpoints and send them to secondary inspection areas. And second, agents continued to have authority for the stop as it extended to 30 minutes, as they acquired reasonable suspicion of criminal activity, both of narcotics and immigration violations. Are you relying on collective knowledge, or do you not think you need to rely on collective knowledge? Your Honor, I think collective knowledge is very, very helpful in this case. I don't think we need to... Actually, yes, Your Honor, I would say to some extent we would need to rely on the fact that when Agent Davidson heard over the radio that there was a drug bust happening at the river, that that was like a real event. I think this Court's precedents indicate that when agents are given information by other agents, that can inform their own reasonable suspicion. So it's Davidson and Garcia that have the drug knowledge, if you will, either collectively or themselves, and they're the ones that you're relying on to develop, to extend the original immigration detention as a now reasonable suspicion drug detention. Yes, Your Honor, they are the agents at the stop who, at the checkpoint, who had knowledge of the narcotics. Obviously, a lot of other agents had knowledge of narcotics activity. Also, I will say that while Agent Davidson testified below that his primary interest once he arrived at the stop was narcotics activity, there was still suspicion of possible immigration... But see, I'm wondering, does it matter if we accept that the original stops for immigration, they're legitimately sent to secondary, as Judge Rievely pointed out, no ID, you need to check all of that, and once in secondary promptly arrive Davidson and Garcia who have drug reasonable suspicion, why isn't the drug reasonable suspicion enough to allow them to continue the detention? Oh, Your Honor, it is the government's position, I think it's correct, that the drug reasonable suspicion is enough. I think there's... What's your time frame for when Davidson gets there with that drug knowledge? You mentioned something about 30 minutes at the outset, but what's your timeline? I mean, it's difficult here because the district court didn't make any findings. That's correct, Your Honor, and I think because the district court didn't make any findings, any reasonable view of the evidence is enough to affirm our position. As far as the particular timeline, the helicopter noticed the drugs at approximately 2.15 p.m. The stop occurred at approximately 2.45 p.m. when the pickup truck driven by the defendant and containing his passengers arrived, and then Davidson and his partner probably arrived somewhere around 2.50 to 3.00 p.m. The record indicates that Davidson, his proffered testimony to the suppression hearing was that he arrived at approximately 2.50. On the other hand, one of the agents at the stop testified at trial that he thought it was about 10 to 15 minutes before Davidson arrived, so I think it would be reasonable to say that the window in which Davidson arrived was probably 5 to 15 minutes after the stop commenced. Within that 5 to 15 minutes, however, the testimony was that agents were still checking on the identification of the individuals at the stop. Where did the record say that? Because I didn't see, once they referred him to secondary, I didn't see that they were making any calls to verify the status of Esquivel or anything along those lines. Where in the record do you see that? Your Honor, Agent Salazar, who is one of the agents testifying at the suppression hearing, testified that, and I can pull out an exact page citation for you in a second, that his partner was still calling into the station to verify the validity of the IDs that were presented by the defendant and his wife. But Salazar says, okay, during this 10 or 15 minutes, did you or perhaps somebody working with you try to radio the station to verify Esquivel's identity? No, we didn't radio the station. Your Honor, it is true that he said that. However, he also testified that one of his to check Esquivel's ID, but rather to check the validity of the IDs that the defendant and his wife presented, which is still a valid immigration purpose for the stop. What case says that if they answer questions and produce an ID that you can continue to detain them? Remember, these are suspicionless stops. Yes, Your Honor, these are suspicionless stops. However, at this point, I will say I can't think of a particular stop at a Border Patrol checkpoint. I can think of cases in which Terry stops extended for over an hour, and this court actually said that they were valid. Those are stops where there's suspicion at the outset. Yes, Your Honor. However, here, when the stop commences and there are three individuals in the vehicle with no ID, and then there are two individuals in the car who have ID, it's a valid use of the Border Patrol's authority, I think, under a reasonable view of checking on immigration status. Well, the whole justification for Martinez-Fuerte and these suspicionless stops is to verify immigration status. So how do you deal with the fact that Salazar said he had no reason to believe that these people had any immigration problems? Your Honor, I would say that Martinez-Fuerte also says that he doesn't need a reasonable suspicion of an immigration problem. At a Border Patrol checkpoint, the Border Patrol has... To stop the car in the first place and to do the initial check. Yes, Your Honor. But you're saying that if that initial check leaves the officer satisfied that they're lawfully in the United States, then he can continue the detention? Your Honor, I think it's a reasonable view of the evidence that when an officer – that his testimony taken into account with the fact that there were people in the car with no ID, that even if he may not have had some particular reason for thinking that they were illegal, he's still within his authority to just do due diligence and check. But there's some discussion of the fact that sometimes people have, you know, illegal IDs or fake IDs. And so you've got three people with no ID, then you have two people with ID, and you're not really sure what's what with these people, so you're checking out the ones with the ID to check out that the IDs are valid. Yes, Your Honor. And you're saying that's reasonable as part of that original stop. And very soon into that, we get the drug knowledge people, if you will, show up, the drug knowledge officers. And he's already said that 10 to 15 minutes is reasonable for that initial rummaging around, and then they show up with their knowledge, and then he's challenging that knowledge. But that's a separate question, it seems to me. Yes, Your Honor. I think that there is testimony in the record that IDs are not always accurate. And so even if – his testimony, I think there's a fair – one can fairly read his testimony as saying, no, I didn't have a particular reason for thinking that they're That doesn't necessarily indicate that he was like utterly convinced that they were fine or that he didn't feel that he had the authority to do due diligence and further confirm that these IDs – So how long does the government think – I understand that at some point, we're trying to figure out where, there's potentially this evidence of sufficient suspicion of drug trafficking. But putting that to the side, just an immigration checkpoint, what's the of those individuals? Your Honor, no case has set an outer deadline. If one wanted to make comparisons to some Terry Stott cases, there are cases indicating that Terry Stott start to become perhaps less legitimate around the 90-minute mark. I don't know that necessarily any case would be – Oh, there's plenty that have been struck down before that. And again, those are cases where there's suspicion to begin with. Let me ask you the same thing I asked Counsel Oppenheimer. You haven't really argued harmless error, but I'm just wondering what it is, assuming that the defendant can't suppress Esquivel's statement, I think that's pretty clear. What did his statements add that was inculpatory to Esquivel's statements that would make the difference? So if we sent it back without the defendant's statements, what would be different about the trial? Your Honor, I think that a harmless error argument would be very strong. Then why didn't you make it? Your Honor, I cannot answer that question. Because I have to say, it may not be the very first one, but it's among the first briefs I've ever seen in a suppression case where no one says anything about what was suppressed, just his statement. There's no, like, what was the statement? There's no, oh, it was a, we found drugs in the trunk. It was, I'm used to knowing from the briefs. And I've been struggling through this record trying to figure out what it is that's this terrible thing the defendant said that needs to be suppressed. And his attorney couldn't tell me. He said it's this inconsistent story. Can you tell me what it is that would have been suppressed if this was granted that was so inculpatory that it's a problem? Your Honor, I think that the defendant did make a variety of inculpatory statements. The first statement he made is right as he arrived at the stop, he indicated that he was out with the watering truck with Escobel. That statement could not be suppressed, I think, under any view of the law because it was made almost immediately upon arriving at the stop. Then second, when Agents Davidson and his partner Garcia arrived, he made a variety of other statements to Agent Davidson. Agent Davidson questioned him and Escobel separate. This is during that initial period standing in the secondary? Yeah, this would be at secondary, Your Honor. And so during that period, Agent Davidson questioned Escobel first. Escobel indicated that he and the defendant were hired by a man named Johnson to go work in Waterson Fields. However, he didn't know Johnson's first name. He didn't have Johnson's phone number. This is Escobel, then? This is Escobel, yes. And then moving on to Agent Davidson's questioning of the defendant, he asked the defendant what was going on. The defendant indicated that he was hired to be a driver by Escobel. He didn't mention Johnson's name, however. He also didn't know how much Escobel was going to pay him. He also, when asked if he had any knowledge of how to operate the truck or could he pantomime the movements of what you would do to operate this pump, he was unable to do that. And so a lot of those statements, because they were so vague, I think create a lot of suspicion of criminal activity and are inculpatory. However, I think for the purposes of harmless error at trial, I know that there was an Allen charge, and so one could think that the jury was having perhaps a little trouble agreeing. But the evidence at trial was quite strong. There was... See, I'm wondering, I mean, his statements allow you to have an alternate narrative without having to put him on the stand. If you suppress those, all we got is Escobel. Yes, Your Honor. And if the jury didn't believe Escobel at all, I don't think they could have convicted him. So that's a problem, because you've got to believe that Escobel's involved in the drugs and all of that to convict the defendant. I mean, that's necessary. So I'm just struggling really, because as I said, usually the suppression is a confession, I did it, or it's a bundle of drugs in the trunk, and I don't have any trouble understanding why we're trying to suppress this. But here it's so vague, and even this exchange has left me a little bit puzzled. But it's fine. I mean, it is what it is. Y'all made the arguments you've made. I'm just so puzzled by all of this. Your Honor, I agree. I came onto this case after it already started. I do believe that a harmless error argument could be very strong, because we're not talking about the suppression of a confession here. The defendant never confessed. He went to trial. And you're correct, a reasonable jury could not have convicted the defendant without believing Escobel's testimony. And there was tons of other evidence at trial connecting the defendant to this truck. There was testimony from insurance agents who talked about how the defendant helped get the truck insured. So there was a lot of testimony at trial against the defendant, and these statements are a minor part of it. Getting back to, I think, your question, Judge Costa, I think that when a Border Patrol agent stops a vehicle, you're correct that comparisons to Terry are different because there's no reasonable suspicion at the beginning. But I think policy-wise, when the Border Patrol is stopping a vehicle and people don't have identification, it's a valid use of their authority to check the people who do have identification. I think if I could point to one case that's not cited in our brief, it's United States v. Chavez. I think it was decided by this Court in 1993. That case indicated that, for example, extending a Terry stop in order to check ID in a police computer like in the computer they have in their cruiser is, of course, a legitimate enforcement activity. I asked the questions about time, so now I'm rebutting what I'm saying. I think if you look at the recent Supreme Court case law on Terry stops, the analogy you're making, what really matters is not so much the time. There's obviously some point at which things become unreasonable, but what really matters is whether what the police are doing during the stop is related to the initial purpose of the stop. In Rodriguez, a couple of years ago, the Supreme Court suppressed evidence because they said it has to be related to the initial reason for the traffic stop, or if you develop evidence of drugs, it has to be related to a drug investigation. You can't just start asking unrelated stuff. That brings me back to, before Davidson arrives, the only evidence you have that the agents at Secondary were doing a further investigation of immigration status was Salazar's comments that his partner was running checks? Yes, well, actually no, Your Honor. I'd say that we also have evidence that Salazar was asking Esquivel and the individuals without ID questions like, you know, what was your birthday and, you know, sort of biographical information. And that was at Secondary? That was at Secondary, yes, Your Honor. While there was testimony that he didn't, in fact, radio to the station yet, he was still asking those questions. And I think that, you know, again, we're under a very differential standard of review. We only need any reasonable evidence to support the idea that in this case, you know, particularizing that standard of review, does any reasonable view of the evidence support the idea that immigration investigation was ongoing when Davidson arrived, as Davidson had tons of reasonable suspicion of all kinds of other stuff that could extend the purpose of the stop? I think the answer is yes, a reasonable view of the evidence supports that immigration investigation was ongoing when Davidson arrived, and I think that's all the government needs here. One other thing that I wanted to address is that the defendant, or sorry, the appellant, especially in his reply brief, raises the specter of some sort of unconstitutional de when the individuals were transported to the Border Patrol station, and then when they were formally put under arrest. One thing I would say there is that even if this court were to determine that they were subject to the equivalent of an arrest when they were transported to the Border Patrol station, I think, you know, under a probable cause standard, the government has probable cause at that point to arrest them anyway. So I don't believe that that should factor in the decision. And then another, you know, again, I would say that, you know, if the court doesn't have further questions, I'm happy to sit down. A reasonable view of the evidence suggests that immigration investigation was ongoing when Davidson arrived. Oh, Judge Nance. You can sit down, but I would like you to file a 28-J to give us the site of that case so that counsel opposite also has it as well. The Shyvana's case you said you didn't cite. Oh, I may actually have it right here, Your Honor. We can still happily file a 28-J. I just don't like to be searching around for something. Okay. Yeah. I'll... If you file a 28-J, where are you located? You're in Houston. Okay. You can file it today then. All right. Thank you, Your Honor. A reasonable view of the evidence supports the government's position. We ask that the court affirm. Thanks. Okay. Thank you. Is it normal in Brownsville for these suppression rulings not to have any reasons? I mean, I know our case law recognizes the situation, but I find it very unusual that there's no reasons. I mean, often there are oral reasons. I understand that, but in your experience there, is this typical? There's just a one word, denied or granted? Yeah. It's usually like this, Your Honor. Hmm. I think it's a pretty heavy docket. Yeah. It's probably one of the heaviest in the country. Your Honor, if I may address a couple of points. Sure. I've noticed the questions of Your Honor about the harmless error concepts that was never raised. This was exactly what I was anticipating the government say. In fact, I anticipated the government at the motion to suppress would say, okay, fine, we'll suppress it. I have enough to convict him anyway. And in that case, I said, well, the whole strategy would be either negotiate a deal or we go to trial and Esquivel made him do it. He's just going on as a Duke. But that was no longer available because the conflicting stories he would give. But see, the conflicting stories are being given once Davidson arrives, and Davidson's the guy with the reasonable drug suspicion. Again, I know you contest that. That's another question. But it doesn't seem like much, he didn't say much until then. So it's a kind of cause and effect, I guess. And he never confessed. But when Your Honor says they have to believe Esquivel to convict, if they have doubts about Esquivel, they have to believe his story made sense. I'm talking about Gonzales' story made sense. The fact that Gonzales' story didn't make sense compared to the actual facts, the truck wasn't in working condition, it had problems, made the culpability of Gonzales appear clearer to the jury so they didn't need only not to believe. But that questioning that elicited that information was Davidson et al. And so that rises and falls on whether those guys had reasonable suspicion of the drug situation, which you contest, government says they did, judge said they did, or implicitly said they did. Your Honor, I would ask at the time... But if they lacked suspicion before then, then any fruits of that go away. That's correct. But it's important, sometimes it's difficult because I'm thankful that you've reviewed the record thoroughly. But if you look individually, the three separate hearings that deal with the same issue, the preliminary exam immediately after the arrest, the suppression hearings that happened after two continuations from the government, and the trial where this case agent didn't take the stand and wasn't there. But on suppression, you're saying we're allowed to look at the preliminary hearing? It's part of the record. I think it's a record on appeal. So at the preliminary exam, in fact, I'm quoting... It's not limited to the suppression record in front of the... It is, Your Honor, it is. On page 12 of my opening brief, there was a question on where Mr. Agent Salazar is saying that he basically, when he was asked, it was for the purpose of verifying Mr. Esquivel's citizenship. Is that correct? And he answered, citizenship and his identification. Then he said, now at the time, you were any defendants aware that there were also suspects in the drug investigation? Mr. Salazar said, no, sir. Okay. Were you aware? And he says, no, sir. So the person who sent them to secondary, who talked to them at secondary, is testifying in court under oath that this was purely initially just an arrest for immigration purpose, which I believe is not true. It's a story. The government at that time, even at the preliminary exam level, they didn't put all the facts that later, supposedly, they had them at trial. But this is another issue. So I would like the court just to compare these three statements at the time when they arrested them. They didn't have all the evidence. And interestingly, Judge Costa asked, they never checked their ID, but they are telling the court that they already checked the ownership of the tanker truck. So you could find in the tanker that he had ownership of that vehicle, so presumably had papers to have ownership of it. It negates the story that they had doubts whether he's a U.S. citizen or not. He's on the border. Well, I think a non-U.S. citizen can buy a truck. The issue is not if he's a citizen. That wouldn't be an illegal entry. I think you can be, there are people who are not legally here who own cars, houses, apartments, and all kinds of other things, and live here for 20 years. And then we see them because they're stopped on a traffic stop. I understand that. But he had the ownership in his name with his own driver's license. Zobolo, when they were asked, well, didn't you know from Zobolo that he's a U.S. citizen? Then you knew his address. They said no. Okay. Thank you, Counselor. We appreciate it. Mr. Hajar, I see that your court appointed. We appreciate you accepting the appointment, and we appreciate both lawyers' presentations here today, and your case is under submission.